WO          IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


JONATHAN CORSON,                          )
                                          )
                              Plaintiff,  )
                                          )
          vs.                             )
                                          )
JAMHI HEALTH AND WELLNESS, INC.,          )
                                          )          No. 1:19-cv-0016-HRH
                              Defendant.  )
_____  )


<u>O R D E R</u>

<u>Motion for Summary Judgment</u>

Defendant JAMHI Health and Wellness, Inc. moves for summary judgment on all of plaintiff Jonathan Corson's claims.[1]  This motion is opposed.[2]  Oral argument was not requested and is not deemed necessary.

<u>Facts</u>

Defendant "is a 501(c)(3) not-for-profit corporation located in Juneau, Alaska with the mission of Helping People Live Their Own Best Lives."[3]  "[T]he organization was

---

[1]Docket No. 15.

[2]Docket No. 19.

[3]Affidavit of Dr. David Branding at 1, ¶ 3, Exhibit A, Defendant JAMHI Health and
(continued...)

Case 1:19-cv-00016-HRH   Document 21   Filed 02/07/22   Page 1 of 36

established to ensure there was always safe affordable housing in Juneau for adults with mental illness."[4] Defendant's "Lemon Creek Campus and Salmon Creek Housing's Lodge facilities provide community housing and support services for adults with severe mental illness and co-occurring substance use disorders."[5] "Services include mental health treatment services provided by an interdisciplinary treatment team in a therapeutically structured, supervised environment. . . ."[6]

On July 20, 2018, defendant offered plaintiff the position of Assistant Residential Services Director.[7] The offer letter provided that "[t]he probationary period for new employees is 12 months from the date of hire."[8] Plaintiff accepted defendant's offer of employment on July 21, 2018,[9] and his first day of employment was September 10, 2018.

On September 17, 2018, plaintiff signed a Statement of Acceptance, which provided that "I have received and will read the JAMHI Employee Handbook to make myself aware

---

[3](...continued)
Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[4]Id. at 2, ¶ 3.

[5]Id. at 2, ¶ 4.

[6]Id.

[7]Attachment 1, Affidavit of Louann Gladwill, Exhibit D, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[8]Id.

[9]Id.

-2-

of polices and procedures under which I am subject as a JAMHI employee."[10]  The Handbook provided that the probationary period for a new hire was twelve months and that the purpose of this period was to "closely observ[e] the employee's work and adjustment to the position."[11]  The Handbook also contained a section entitled "Deficit Reduction and False Claims Act[.]"[12]  This section contained a statement that "the federal False Claims Act protects anyone who files a lawsuit under the Act from being fired, demoted, threatened or harassed by their employer as a result of filing a False Claims Act lawsuit.  JAMHI policies strictly prohibit retaliation in any form against an individual reporting an issue in good faith."[13]  The section also provided that "[q]uestions regarding the DRA or FCA should be routed to the director of performance improvement and compliance."[14]

Defendant also has a separate Whistleblower Protection policy, which plaintiff reviewed as part of his new employee orientation on September 17, 2018.  This policy provides that "[i]f an employee has knowledge of or a concern about fraudulent activity, the

---

[10]Attachment 6 at 1, Gladwill Affidavit, Exhibit D, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[11]Id. at 2.

[12]Id. at 7.

[13]Id.

[14]Id.

employee is to contact the Director of Performance Improvement and Compliance."[15]  The policy further provides that "JAMHI staff will not retaliate or discipline an individual because of his or her status as a whistleblower" and that "[a]ny whistleblower who believes he/she is being retaliated against should promptly contact the Director of Human Resources."[16]

Plaintiff also reviewed the JAMHI Corporate Compliance Plan as part of his orientation.[17]  JAMHI's Corporate Compliance Plan "is designed to prevent, detect, and correct any instances of noncompliance with applicable federal and state law and program requirements of federal, state and private health care plans."[18]  The Plan further provides that

> the Employee Personnel Handbook and Policy and Procedures Manual detail procedures expected to be followed by employees. Adherence to the Corporate Compliance Plan and Code of Ethics is a condition of employment at JAMHI.  Every JAMHI employee has the responsibilit[y] to report any compliance concerns to the Compliance Officer.[[19]]

On September 17, 2018, plaintiff also completed Compliance Orientation with Sandy Berry, Director of Performance Improvement & Compliance, during which Berry explained

---

[15]Attachment 7 at 1, Gladwill Affidavit, Exhibit D, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[16]Id.

[17]Id. at 3.

[18]Attachment 8 at 1, Gladwill Affidavit, Exhibit D, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[19]Id.

her role, procedures for raising allegations of fraud, waste, abuse and wrongdoing, and anti-retaliation procedures.[20]

On September 26, 2018, plaintiff signed a copy of his job description.[21] The job description provided that plaintiff, "[u]nder the direction of the Residential Services manager," was to

> assist[] in the coordination and administration of all JAMHI Residential services. [Be r]esponsible for supervision of Residential Living Specialists at JAMHI Salmon Creek and Lemon Creek Residential facilities. [Be r]esponsible for developing and maintaining the Behavioral Health Associate work schedule, ensuring necessary coverage is provided for each site, and providing coverage in the event of an emergency.[22]

Other specific job duties in plaintiff's position description included "the provision of daily direct supervision of Residential Living Specialists and Case Managers[,]" providing "training for all new residential staff[,]" developing "monthly BHA/RLS/CM work schedules," assisting with recruitment of residential staff, "shar[ing] on-call duties with [the] residential director[,]" sharing "in providing on-call Residential support 24/7[,]" attending staff meetings, and "provid[ing] supervision to Behavioral Health Associates when needed

---

[20]Attachment 7 at 3, Gladwill Affidavit, Exhibit D, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[21]Attachment 2 at 4, Gladwill Affidavit, Exhibit D, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[22]Id. at 1.

-5-

to execute daily operations. . . ."[23]  Plaintiff's duties also included "ensur[ing] Case Management and Residential Living Specialists documentation is completed and tracked in compliance with policies and procedures of JAMHI, State, and Medicaid/Medicare requirements" and "[p]rovi[ding] follow-up and ongoing Progress and CareLogic training as necessary to Residential staff[.]"[24]

On January 22, 2019, plaintiff's job description was changed "from providing daily supervision of Residential Living Specialists and Case Managers (a total of 4) to providing daily supervision of Behavioral Health Associates [BHAs] (a total of 13)."[25]  Plaintiff contends that this change in his job description was made because the original description did not accurately reflect his actual duties.

On February 4, 2019, the Lemon Creek facility "sustained a 'catastrophic event.' Approximately 11 group home/assisted living clients were displaced by a malfunctioning fire suppressant system.  As a result, the homes were flooded and clients were displaced from their living arrangements."[26]  Plaintiff alleges that "[a]s a consequence of this event, [he] convened with HR, representatives from [the] quality assurance team, and leadership on multiple occasions in March 2019 regarding the viability of the residential assisted living

---

[23]Id. at 2-3.

[24]Id. at 3.

[25]Attachment 1 at 1, Affidavit of Kyla Allred, Exhibit I, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[26]Complaint at 3, ¶ 16, Exhibit 1, Notice of Removal, Docket No. 1.

-6-

program, and whether the long term care of client needs and rights of individuals served were adequately being met under state/federal guidelines."[27]

On March 7, 2019, plaintiff met with Kyla Allred, defendant's Human Resources Director, and Paul Chisholm, defendant's Residential Services Director. At this meeting, plaintiff expressed his concern that his job description did not accurately reflect what he was actually doing.[28] Plaintiff was concerned that he would not be able to train all the BHAs plus schedule and supervise them.[29] Allred, Chisholm, and plaintiff "discussed possibly taking away the supervision of the BHA's."[30] Following the March 7, 2019 meeting, Chisholm began to revise plaintiff's job description again.[31]

On March 12, 2019, plaintiff met with Allred to discuss how long it was taking Chisholm to revise his job description.[32] Plaintiff told Allred that "he was okay keeping the supervision of the BHA's and the scheduling."[33] When Allred "stated it was my understanding that he didn't think he could [do] the supervision and be the BHA trainer[,]" plaintiff

---

[27]Id. at 3-4, ¶ 17.

[28]Attachment 1 at 1, Allred Affidavit, Exhibit I, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[29]Id.

[30]Id.

[31]Id.

[32]Id.

[33]Id.

-7-

again brought up his belief that his job description did not reflect what he was actually doing.[34] Allred noted that plaintiff seemed bothered by the fact that his job description stated that one of his duties was to "facilitate" training because he did much more than "facilitate."[35] Plaintiff told Allred that he felt "responsible for the development and implementation of the curriculum" and that his "professional goal would be working closely with Human Resources to develop training curriculum for the whole organization. . . ."[36] Plaintiff also told Allred that he was dissatisfied with the on-call situation because he felt that many of the situations he was contacted about "after hours did not constitute an emergency. . . ."[37] Plaintiff "kept reiterating that he was not a cop or a fire fighter and he was not going to put himself in a harmful situation. . . ."[38] Plaintiff told Allred that he was not getting enough sleep and did not have time for self-care because of the on-call situation.[39] Allred told plaintiff he "needed to stay focused on the residential program" and suggested that he and Chisholm could perhaps rotate on-call duty.[40]

---

[34]Id.

[35]Id.

[36]Id.

[37]Id.

[38]Id.

[39]Id.

[40]Id. at 2.

After the March 12, 2019 meeting between Allred and plaintiff, plaintiff and Chisholm agreed to rotate on-call duty weekly and Chisholm "sent out a[n] email to staff letting them know about the call rotation and remind[ing] them to use the Crisis list located in each home for what constitutes an emergent need."[41]

On March 15, 2019, Allred, Chisholm, and Dr. Branding met "to discuss [plaintiff] and his concerns with on-call along with some other performance issues."[42] Chisholm "was encouraged to continue to coach [plaintiff] and be very specific about expectations and setting time lines."[43] Dr. Branding avers that plaintiff "objected to JAMHI's on-call policy, training curriculum, and the lack of data to make decisions. He desired a different role, and a new job description."[44]

Plaintiff testified that he met with Chisholm three to five times to discuss his job description.[45] Plaintiff testified that he wanted his job description "updated and revised" so that it reflected "what my duties were, where they began, where they ended."[46] Plaintiff

---

[41]Id.

[42]Id.

[43]Id.

[44]Branding Affidavit at 3, ¶ 6, Exhibit A, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[45]Deposition of Jonathan Corson at 28:12-13, Exhibit C, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[46]Id. at 28:14-15.

testified that there was too much work, that the work load was "unsustainable" and that "[n]obody can do this much work."[47]

Plaintiff also contends that around this same time frame (mid-to-late March 2019), he "brought up numerous concerns with redacting/amending billable service hours for employees that were terminated or voluntarily quit during our crisis event" on February 4, 2019.[48] Berry avers that "[i]t was discovered during a pre-billing compliance review that former JAMHI BHA Corey Peratrovich's progress note documentation for five dates of service needed non-substantive clarification to meet Medicaid payor requirements."[49] Plaintiff states that he

> met with JAMHI QA director Mansour Sigideli . . . to amend what amounted to tens of thousands of dollars in RSS billable service hours. This was especially the case for one specific BHA whom I supervised (Cory Peratovich) [sic] where I amended all his notes after he was terminated. . . . I felt this was wrong and unethical and possibly amounted to Medicaid fraud.[50]

---

[47]Id. at 28:17-18.

[48]Response to Interrogatories, Exhibit B at 5, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[49]Affidavit of Sandy Berry at 2, ¶ 4, Exhibit G, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[50]Response to Interrogatories, Exhibit B at 5, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

Plaintiff testified that he "did fix the notes, because that's what I was told to do."[51]  Plaintiff testified that he "went through the system with a QA specialist . . .  He walked me through it.  He wrote out the statement and he had me submit it."[52]  Plaintiff testified that in his opinion, he should have only written the note "if I had provided the service."[53]  Berry avers that "[t]he original documentation submitted by BHA Peratrovich was not altered in any way, and the addenda prepared and signed by [plaintiff] were not substantive involving services provided but rather technical in nature such as a correction to the time the service was provided or checking of a goal (when underlying progress note was explicitly clear as to what goal was addressed that date of service). . . ."[54]  Dr. Branding avers that "[a]t no time during his employment did [plaintiff] report to me any Medicaid/Medicare billing concerns or any possible fraudulent billing practices.  [Plaintiff] never discussed with me any concerns regarding [the] correction of former JAMHI BHA Cory Peratrovich's service notes."[55]

Plaintiff also contends that throughout his employment with defendant, he voiced concerns "about the use of arbitrary JAMHI policies and procedures . . . that inherently

---

[51]Corson Deposition at 50:11-12, Exhibit C, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[52]Id. at 50:14-16.

[53]Id. at 51:16-17.

[54]Berry Affidavit at 2-3, ¶ 4, Exhibit G, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[55]Branding Affidavit at 4, ¶ 12, Exhibit A, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

-11-

restricted client rights (something you are not supposed to do when receiving Medicaid/tax payer funds)."[56]  "These restrictions included . . . restricted access to the community . . . ; restricted access to individual property . . . [;] restricted access to household dwelling areas . . . [;] and the use of chemical restraint "instead of a less restrictive measure. . . ."[57]  Plaintiff stated that

> [d]espite having 24/hr staff, supposedly caring/billing for needs of individuals, [clients] were shuffled back to their rooms after dinner, told they could not leave the facility . . . , told they couldn't have second portions at lunch/dinner, withholding cigarettes/property and told to go back to bed if they stepped out of their rooms at night . . . again, all under the auspices of billing Medicaid for 24/7 client care.[58]

Plaintiff "[s]tated to superiors that if clients were to be denied above mentioned rights, that a Human Rights Committee should be created to review the implementation of these 'blanket' policies, effecting the rights of all served."[59]  Plaintiff contends that in response to these concerns, Chisholm told him "'to shut up and do what I was told.'"[60]

---

[56]Responses to Interrogatories, Exhibit B at 4, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[57]Id.

[58]Id.

[59]Id. at 5.

[60]Id.

-12-

On March 22, 2019, plaintiff met with Allred to again complain about the on-call situation, telling her that he had a different approach to handling a crisis than Chisholm.[61] Plaintiff told Allred that "he was so exhausted he couldn't think" and she suggested that he go home and rest, which he did.[62]

On March 26, 2019, Debra Arthur-Wilkinson, supervising clinician for defendant's residential clients, sent an email to Chisholm in which she expressed a number of concerns.[63] Specifically, Arthur-Wilkinson wrote that she was concerned about the following:

1. Boundaries – I believe with the email put out by [plaintiff] we are pushing the boundaries that we are already trying to hold firm with our already vulnerable population.

2. Groundings – this goes along with boundaries. I do not believe we have our staff trained in grounding. We are using a "touchy feeling" kind of consoling which is confusing and often times damaging to our fragile clients.

3. Trainings – I realize we have had many fires we have had to put out; and I agree. With that being said, we are seriously lacking in training our staff in the essentials – basic mental health, grounding techniques, boundaries, and recognizing deficits in cognitive skills. . . . I realize [plaintiff] wants to be the trainer, however, I do not believe [he] has the clinical training skills to train in these areas. I also do not believe he has the temperament

---

[61]Attachment 1 at 2, Allred Affidavit, Exhibit I, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[62]Id.

[63]Attachment 3, Gladwill Affidavit, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

-13-

to train in these areas – balancing knowledge with ego and understanding.  I am so sorry to say that.[64]

Also on March 26, 2019, Allred spoke with Dr. Branding and they decided that plaintiff was "not working out" and that he would be let "go within his probationary period."[65]  Dr. Branding avers that they "decided that [plaintiff's] performance had not improved, and that he had demonstrated that he was unable or unwilling to complete the duties necessary for his position as Assistant Residential Services Director."[66]

Later in the day on March 26, 2019, plaintiff emailed Chisholm and Allred a doctor's note stating that he was to be off work 3/26/2019-3/28/2019.[67]  In response, Chisholm told plaintiff to "not work from home but rest and get well."[68]  Chisholm also asked plaintiff to bring "a doctors note . . . when you are released to come back to work."[69]  Plaintiff responded by stating that he had

---

[64]Id. as 1-2.

[65]Attachment 1 at 3, Allred Affidavit, Exhibit I, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[66]Branding Affidavit at 3, ¶ 7, Exhibit A, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[67]Attachment 1 at 3, Allred Affidavit, Exhibit I, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[68]Attachment 4 at 1, Gladwill Affidavit, Exhibit D, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[69]Id.

-14-

been experiencing a significant amount of toxic stress lately, trying to manage all the events effecting [sic] us at JAMHI. It has lead me to seek the council [sic] of my doctor. Upon returning, I would like to have a discussion with you and Kyla about whether or not I can continue employment. I've worked for many years in this setting and have never felt the magnitude of stress that I've felt in these last few weeks. My body is beginning to break down. As you know, I take my physical and mental health very seriously. My brain is extremely full right now, I need time to rest and collect my thoughts, and do not want to say things I might later regret. I'm following the guidance of my doctor and will just focus on getting well these next couple of days.[70]

On March 27, 2019, plaintiff emailed Allred and advised that he would not be able to get "a return to work certificate before Monday, April 1, 2019."[71] Plaintiff also scheduled a meeting with Allred for when he returned to work.[72]

On April 1, 2019, Allred met with plaintiff and terminated his employment. Plaintiff's termination letter read, in relevant part, as follows:

In accordance with JAMHI's Probationary Policy, all new employees are subject to an initial one-year probationary period. This probationary period allows time for adjustment on the job and an opportunity to determine whether it will be in the best interests of the employee and employer for the employment relationship to continue.

---

[70]Id.

[71]Attachment 1 at 3, Allred Affidavit, Exhibit I, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[72]Id.

Unfortunately, it has been determined that it would be in the best interest of both parties to end the employment relationship effective immediately.[73]

After his termination, plaintiff had numerous conversations with the Alaska Licensing Board about his concerns and on April 24, 2019, he made a formal complaint. On April 30, 2019, the State Attorney General notified defendant that "the Alaska Department of Health and Social Services, Division of Senior and Disability Services, Adult Protective Services" had "received a report of harm regarding individuals at the JAMHI Salmonberry and Timberline homes."[74] The Department investigated the report and issued an investigative report on August 22, 2019.[75] The allegation investigated was that defendant was operating unlicensed assisted living homes.[76] The Department concluded that defendant's "group home facilities should be licensed because they . . . provide[] housing and food services" and other personal assistance to their residents.[77] However, because defendant "decided to scale back

---

[73]Attachment 5 at 1, Gladwill Affidavit, Exhibit D, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[74]Attachment 1 at 1, Branding Affidavit, Exhibit A, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[75]Id. at 9.

[76]Id. at 4.

[77]Id. at 7.

the services provided to residents[, the] group homes no longer meet the definition of an assisted living facility and are not required to be license[d]."[78]

On September 25, 2019, plaintiff commenced this action. In his complaint, plaintiff asserts five causes of action. Plaintiff's first cause of action is a False Claims Act (FCA) retaliatory discharge claim. Plaintiff's second cause of action is a claim for wrongful termination in violation of AS 18.80.220. Plaintiff's third cause of action is a claim for wrongful termination in violation of public policy. Plaintiff's fourth cause of action is a breach of the covenant of good faith and fair dealing claim. Plaintiff's fifth cause of action is a claim for punitive damages.

Defendant now moves for summary judgment on all of plaintiff's claims.

<u>Discussion</u>

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in

---

[78]<u>Id.</u> at 8.

its favor. Id. at 255. "'[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.'" Arandell Corp. v. Centerpoint Energy Services, Inc., 900 F.3d 623, 628–29 (9th Cir. 2018) (quoting T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987)).

Defendant first moves for summary judgment on plaintiff's first cause of action, which is an FCA retaliatory discharge claim. "The False Claims Act protects 'whistle blowers' from retaliation by their employers." Moore v. Calif. Institute of Tech. Jet Propulsion Lab., 275 F.3d 838, 845 (9th Cir. 2002). To establish a prima facie case of retaliation, an employee must show "(1) that the employee engaged in activity protected under the statute; (2) that the employer knew that the employee engaged in protected activity; and (3) that the employer discriminated against the employee because []he engaged in protected activity." Id. "If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action." Neighorn v. Quest Health Care, 870 F. Supp. 2d 1069, 1092 (D. Or. 2012). "If the defendant successfully rebuts the inference of retaliation, the burden of production shifts back to the plaintiff to show that the defendant's explanation is merely a pretext for impermissible retaliation." Id.

-18-

As an initial matter, defendant raises a Rule 8(a) argument that plaintiff has failed to adequately plead that he engaged in protected activity. Rule 8(a)(2), Federal Rules of Civil Procedure, requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" The purpose of Rule 8 is "to give the defendant fair notice of the factual basis of" the plaintiff's claims. Skaff v. Meridien N. Amer. Beverly Hills, LLC, 506 F.3d 832, 841 (9th Cir. 2007). "Rule 8 requires plaintiffs to include enough facts to raise a right to relief above a speculative level[.]" Whitaker v. Tesla Motors, Inc., 985 F.3d 1173, 1176 (9th Cir. 2021) (citation omitted). "[A] formulaic recitation of the elements of a cause of action will not do." Id. (citation omitted). Moreover, a plaintiff may not "rely on anticipated discovery to satisfy Rule[] 8 . . . ; rather, pleadings must assert well-pleaded factual allegations to advance to discovery." Id. at 1177.

"[A]n employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." Moore, 275 F.3d at 845. In his complaint, plaintiff alleges that he engaged in protected activity "[b]y exposing and making a good faith report of fraudulent contracting practices[.]"[79] The only reference to "fraudulent contracting practices" in plaintiff's complaint is in paragraphs 17 and 18:

> 17. As a consequence of this event [11 group home/assisted living clients being displaced due to a malfunctioning fire suppressant system], Mr. Corson convened with Human

---

[79]Complaint at 5, ¶ 24, Exhibit 1, Notice of Removal, Docket No. 1.

Resources, representatives from [the] quality assurance team, and leadership on multiple occasions in March, 2019 regarding the viability of the residential assisted living program, and whether the long term care of client needs and rights of individuals served were adequately being met under state/federal guidelines. Since these services are funded by federal Medicaid, any fraudulent contracting practices related to how these services were provided and billed would be covered by the federal False Claims Act.

18. Mr. Corson raised significant concerns about program policy and procedures outlined in JAMHI's treatment/service model and whether they were sufficiently being met. Mr. Corson outlined these concerns to his immediate supervisor, supervising clinician, and HR director on numerous occasions, stating that these decisions were based out of provider convenience and not from a multi-factored assessment, or data driven discussion about the current, individual specific needs of each client.[80]

Plaintiff argues that these allegations are sufficient for purposes of Rule 8(a). Plaintiff argues that paragraph 17 set out the exact conduct that he was concerned about, namely, "whether the long term care of client needs and rights of individuals served were adequately being met under state/federal guidelines"[81] and that he expressed his concern to management that this was a violation of the FCA.

Plaintiff's complaint is somewhat deficient in that plaintiff has not alleged any specifics as to his protected activity, such as what client needs and rights were allegedly not being met, what state and federal guidelines were allegedly violated, what service and billing

---

[80]Id. at 3-4.

[81]Id. at 4.

practices were allegedly fraudulent, how defendant was failing to meet its treatment/service model, or to whom plaintiff reported these "fraudulent contracting practices" and concerns. Plaintiff's complaint is largely devoid of any factual allegations regarding his investigation into the editing of the service notes or defendant's use of restrictive measures, the conduct he now contends constituted his protected activity. However, given that discovery is complete and defendant has moved for summary judgment on plaintiff's FCA retaliatory discharge claim, the court will consider this claim on its merits, rather than dismissing it because it was not adequately pled.

Turning then to the question of whether plaintiff has made out a prima facie case of FCA retaliation, the first element of a prima facie case requires plaintiff to show that he was engaged in protected activity. "To prove []he was engaged in protected activity, [p]laintiff must show []he was 'investigating matters which are calculated, or reasonably could lead, to a viable [FCA] action.'" Erickson v. Biogen, Inc., 417 F. Supp. 3d 1369, 1384 (W.D. Wash. 2019) (quoting Moore, 275 F.3d at 845). "An FCA retaliation claim contains both an objective and subjective element: (1) whether [p]laintiff in good faith believed and (2) whether 'a reasonable employee in the same or similar circumstances might believe [that [d]efendant was] possibly committing fraud against the government.'" Id. (quoting Moore, 275 F.3d at 845–46). "[I]t is a 'fatal defect' if a reasonable employee in the same circumstances could not conclude there was a false claim." Id. (quoting Hopper, 91 F.3d at 1267.

Plaintiff contends that his protected activity "involved (1) his editing of support service notes, and (2) restrictive measures."[82]  Defendant argues that plaintiff's internal complaints about these two issues do not constitute protected activity for purposes of the FCA.

As for the editing of the service notes, it is undisputed that QA director Sigideli and operations manager Lindsey requested that plaintiff correct or edit service notes prepared by former BHA Peratrovich, whom plaintiff had supervised.  Plaintiff testified that the problem with Peratrovich's notes was that

> there were individual, specific goals in each client's treatment plan that had to be addressed in the billable service note.  In some situations there [were] blanks.  There [were] places where it was not done or it was done horribly incorrectly or addressing another goal that wasn't the one they were supposed to be targeting.[83]

Plaintiff testified that he told Sigideli and Lindsey that he did not "feel right about" editing the services notes.[84]  He told them he had concerns about editing the notes because he was not the one who had performed the service in question.  Plaintiff argues that when he corrected the notes he had no direct knowledge of whether the services were accurately documented or not.  Thus, plaintiff contends that he had a good faith belief that defendant

---

[82]Plaintiff Jonathan Corson's Opposition to Motion for Summary Judgment [etc.] at 11, Docket No. 19.

[83]Corson Deposition at 49:2-8, Exhibit C, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[84]Id. at 48:4-5.

asking him to edit the service notes could lead to a false or fraudulent claim to obtain government funding. Plaintiff insists that there is at least an issue of material fact as to whether he was engaged in protected activity when he voiced his concerns about editing the service notes.

But whether plaintiff had a good faith belief is not enough. Plaintiff must also show that a reasonable employee under the same or similar circumstances would have thought defendant was potentially committing fraud against the government when it asked plaintiff to edit the service notes. Although Berry has averred that the addenda that were prepared and signed by plaintiff were not substantive in nature, but rather technical in nature, it is possible that a reasonable employee would have believed that there was something wrong with being asked to edit the service notes. There is sufficient evidence to create a material question of fact as to whether a reasonable employee would have believed that defendant was committing fraud when it asked plaintiff to edit the service notes. A reasonable jury could conclude that plaintiff was engaged in protected activity when he raised concerns about editing the service notes.

As for plaintiff's concerns about defendant's use of restrictive measures, defendant argues that this could not constitute protected activity because Medicaid and Medicare funding is not conditioned on a certification that its facilities are a "least restrictive environment." In short, defendant argues that plaintiff's concerns had no "nexus to the

-23-

FCA." Hopper, 91 F.3d at 1269. In support of this argument, defendant cites to Berry's affidavit, in which she avers that plaintiff's

> reference to services needing to be provided in the least restric-
> tive environment likely comes from his prior work with individ-
> uals who are subject to the Individuals with Disabilities Educa-
> tion Act. . . . There is no companion law for the individuals that
> JAMHI serves who are provided services related to their mental
> health and/or substance use diagnoses. Further, for the services
> JAMHI staff provided to individuals living in [its] housing
> being referenced by [plaintiff,] those are specifically dictated by
> client centered individualized treatment plan[s] that require[] a
> service authorization approved by the state of Alaska before
> such services would be payable. JAMHI received service
> authorizations for each of the residents that were provided
> services from JAMHI and the level of care was therefore
> deemed appropriate.[85]

Plaintiff, however, argues that Berry's affidavit is not sufficient to establish that his concerns about restrictive measures had no nexus to the FCA. Plaintiff argues that whether Medicaid or Medicare funding is conditioned on defendant's certification that the residential facilities are a "least restrictive environment" is a disputed fact.

But plaintiff offers nothing in the way of evidence other than his belief that this might be a condition of Medicaid or Medicare funding. He offers no evidence that would suggest that a reasonable employee would also hold this belief. And, in fact, the evidence is all to the contrary. In her affidavit, Berry cites to several regulations which govern the payment

---

[85]Berry Affidavit at 3, ¶ 7, Exhibit G, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

of Medicaid to a community behavioral health supplier such as defendant.[86] 7 AAC 135.120

provides, in relevant part, that

> (a) [t]he department will pay a community behavioral health services provider or a mental health physician clinic for services provided to a recipient only if
>   (1) those services are provided under an individualized behavioral health treatment plan that meets the requirements of this section and 7 AAC 135.130;
>   (2) the plan is based on a professional behavioral health assessment under 7 AAC 135.110;
>   (3) the plan is signed and monitored by the directing clinician[.]
>
> (b) By signing a behavioral health treatment plan, a directing clinician attests that in the directing clinician's professional judgment the services called for in the behavioral health treatment plan are
>   (1) appropriate to the recipient's needs;
>   (2) delivered at an adequate skill level; and
>   (3) achieving the treatment goals.

7 AAC 135.130 provides:

> (a) To be eligible for payment under this chapter, a community behavioral health services provider or a mental health physician clinic must maintain, for each recipient served, a clinical record in accordance with 7 AAC 105.230 that also must include a
>   (1) written report that documents the results of a professional behavioral health assessment conducted in accordance with 7 AAC 135.110 that also identifies the
>     (A) recipient's presenting problems, diagnosed conditions, and functional deficits that require treatment; and
>     (B) treatment recommendations for the recipient's presenting problems, diagnosed conditions, and functional impairments; and

---

[86] Id. at 3, ¶ 5.

(2) behavioral health treatment plan that meets the require-ments of 7 AAC 135.120 and includes
(A) the recipient's identifying information;
(B) the date implementation of the behavioral health treatment plan will begin;
(C) treatment goals based on the presenting problems, assessed conditions, and functional deficits that are the current focus of treatment; and
(D) the services that will be used to address the written goals.

(b) The clinical record must include all the changes made to a recipient's behavioral health treatment plan and updates to the professional behavioral health assessment.

Neither 7 AAC 135.120 nor 7 AAC 135.130 conditions payment of Medicaid funds on the provision of services in the "least restrictive environment."

Plaintiff may have had a good faith belief that Medicaid or Medicare funding was conditioned on defendant's certification that its residential facilities were a "least restrictive environment," but no reasonable employee could have had such a belief. Thus, plaintiff was not engaged in protected activity when he raised his concerns about restrictive measures.

But because plaintiff may have been engaged in protected activity when he raised his concerns about editing the service notes, the court must consider whether plaintiff has made out the second element of a prima facie case of FCA retaliation. This element requires plaintiff to show that defendant was aware of his protected activity as it relates to the editing of the service notes.[87]

_____

[87]The court need not consider whether defendant had knowledge of plaintiff's
(continued...)

-26-

"[U]nless the employer is aware that the employee is investigating fraud, the employer [cannot] possess the retaliatory intent necessary to establish a violation of § 3730(h)." Hopper, 91 F.3d at 1269. Moreover, "[u]nder Ninth Circuit law, a plaintiff whose job responsibilities include compliance must meet a higher standard to place h[is] employer on notice of protected activity." Dunlap v. Imaging Associates, LLC, Case No. 3:14-cv-00143-TMB, 2019 WL 4580611, at *17 (D. Alaska Sept. 20, 2019). "[E]mployees whose complaints fall within the scope of their job duties must provide their employers with clear notice of their intent to pursue an FCA action in order to satisfy the second element of a retaliation action under the statute." Sicilia v. Boeing Co., 775 F. Supp. 2d 1243, 1254 (W.D. Wash. 2011). "[T]he employee must make it clear to the employer that the employee's actions go beyond the assigned task in order to overcome the presumption that he is merely acting in accordance with his employment obligations." Dunlap, 2019 WL 4580611, at *17 (citation omitted).

As to the editing of the service notes, the parties disagree as to whether this heightened notice standard applies. Defendant contends that it does; plaintiff contends that it does not. The court need not resolve this dispute because even if the heightened notice standard does not apply, plaintiff has still failed to make out the second element of his prima facie case of FCA retaliation.

_____

[87](...continued)
restrictive measure concerns as plaintiff's raising of these concerns did not constitute protected activity.

The undisputed facts show that all plaintiff did was tell Sigideli and Lindsey that he did not "feel right about" editing the service notes.[88] Plaintiff did not say that he was concerned about fraud or that he thought he was being asked to do something illegal or unlawful. There is no evidence that plaintiff ever shared his concerns about editing the service notes with anyone other than Sigideli and Lindsey. It is undisputed that plaintiff did not report his concerns to Berry, the Director of Performance and Compliance, as required by defendant's policies and procedures regarding compliance issues. There is no evidence that plaintiff reported his concerns to Dr. Branding, Chisholm, or Allred. Based on this undisputed evidence, no reasonable jury could conclude that defendant was aware that plaintiff was investigating fraud when he expressed his concerns about editing the service notes.

There is not, as plaintiff argues, a factual dispute as to whether he raised his concerns about editing the service notes to Dr. Branding. Plaintiff relies on his answer to Interrogatory No. 11, in which he stated that he "routinely voiced my concerns . . . during administrative meetings with directors and CEO."[89] However, this response was directed to defendant's use of "restrictive measures" and had nothing to do with the editing of the service notes.

---

[88]Corson Deposition at 48:4-5, Exhibit C, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

[89]Response to Interrogatories, Exhibit B at 4, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

-28-

Because plaintiff has failed to make out the second element of his prima facie case, defendant is entitled to summary judgment on plaintiff's FCA retaliatory discharge claim. But even if plaintiff had made out the second element of his prima facie case, defendant would still have been entitled to summary judgment on this claim.

The third element of a prima facie case of FCA retaliation "requires a showing of 'but for' causation: [plaintiff] must demonstrate that his termination would not have occurred . . . but for the impermissible retaliation by the employer." <u>Dunlap</u>, 2019 WL 4580611, at *20. "In the retaliation context, the Ninth Circuit has held that when adverse employment decisions are taken within a close proximity after protected activity has been made, causation may be inferred." <u>Brazill v. California Northstate College of Pharmacy, LLC</u>, 949 F. Supp. 2d 1011, 1024 (E.D. Cal. 2013). "The Ninth Circuit has found a prima facie case of causation, for example, when adverse employment actions were taken more than two months after an employee filed an administrative complaint, and more than a month and a half after the employer's investigation ended." <u>Id.</u> Here, plaintiff's termination closely followed the voicing of his concerns about editing the service notes. Thus, causation could be inferred.

If plaintiff had made out all three elements of his prima facie case, then the court would have considered whether defendant had articulated a legitimate reason for terminating plaintiff, which it did. Defendant terminated plaintiff because other employees were complaining about him and he was not getting his work done. As Dr. Branding has averred,

defendant was "dissatisfied with [plaintiff's] performance, and he was ill-suited for [his] position."[90]

The burden would have then shift to plaintiff to show pretext. "[A] plaintiff at the pretext stage must produce evidence in addition to that which was sufficient for h[is] prima facie case in order to rebut the defendant's showing." <u>Dunlap</u>, 2019 WL 4580611, at *23 (quoting <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1220 (9th Cir. 1998)). "In general, a '[p]laintiff may prove pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" <u>Id.</u> (quoting <u>Brazill</u>, 949 F. Supp. 2d at 1020). "'When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial.'" <u>Id.</u> (quoting <u>Godwin</u>, 150 F.3d at 1221). "However, '[i]f [the] plaintiff offers indirect evidence that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable, such evidence must be specific and substantial in order to create a triable issue of fact as to" the defendant's motivation. <u>Id.</u> (quoting <u>Brazill</u>, 949 F. Supp. 2d at 1020).

Plaintiff argues that there is evidence that defendant's reasons for his termination were pretextual. But, the only evidence plaintiff cites to, other than the temporal proximity

---

[90]Branding Affidavit at 3, ¶ 7, Exhibit A, Defendant JAMHI Health and Wellness, Inc.'s Motion for Summary Judgment [etc.], Docket No. 15.

between his termination and his alleged protected activity, is his answer to Interrogatory No. 16. Plaintiff contends that this answer contains evidence that his job performance was "exemplary." The problem with plaintiff's contention is that the answer to Interrogatory No. 16 is not actually in evidence. Plaintiff submitted no evidence in support of his opposition to the instant motion to summary judgment, instead relying on the evidence that defendant had submitted in support of its motion. Nowhere in defendant's evidence is there an answer to Interrogatory No. 16. Because plaintiff offered no evidence of pretext, beyond that relied upon in making out his prima facie case, plaintiff did not create a question of fact as to pretext.

In sum, defendant is entitled to summary judgment on plaintiff's FCA retaliatory discharge claim. Even if plaintiff made out a prima facie case, which he did not, defendant articulated a legitimate reason for terminating plaintiff and plaintiff did not show that this reason was pretext.

Defendant next moves for summary judgment on plaintiff's second cause of action, in which plaintiff asserts a claim pursuant to 18.80.220(a)(4). AS 18.80.220(a)(4), which is part of Alaska's anti-discrimination statute, provides that "it is unlawful for . . . an employer . . . to discharge, expel, or otherwise discriminate against a person because the person has opposed any practices forbidden under AS 18.80.200 - 18.80.280 or because the person has filed a complaint, testified, or assisted in a proceeding under this chapter[.]"

> To establish a prima facie case of discriminatory retaliation, a
> complainant must establish that (1) the complainant engaged in

a protected activity (e.g., opposed a discriminatory practice); (2) the complainant suffered an adverse employment action; and (3) there was a causal link between the protected activity and the employer's action. Causation may be inferred from the proximity in time between the protected action and the allegedly retaliatory action.

Raad v. Alaska State Com'n for Human Rights, 86 P.3d 899, 905 (Alaska 2004).

Plaintiff's state-law retaliatory discharge claim fails because there is no evidence that he engaged in protected activity, i.e., that he "opposed a discriminatory practice[.]" Id. There is no evidence that plaintiff reported or opposed any practice by defendant related to discrimination against a person in terms of compensation, conditions or privileges of employment "because of the person's race, religion, color, or national origin, or because of the person's age, physical or mental disability, sex, marital status, changes in marital status, pregnancy, or parenthood. . . ." AS 18.80.220(a)(1).

Plaintiff's argument that protected activity related to investigating false certifications can be the basis for a claim under AS 18.80.220(a)(4) fails. AS 18.80.220(a)(4) makes it unlawful to terminate an employee if he has "opposed any practices forbidden under AS 18.80.200-18.80.280. . . ." Investigating fraud against the government is not included in the list of practices forbidden under AS 18.80.200-18.80.280. Thus, defendant is entitled to summary judgment on plaintiff's wrongful termination claim based on AS 18.80.220(a)(4) as asserted in plaintiff's second cause of action.

In his opposition, plaintiff argues that in his second cause of action he also asserted a claim pursuant to AS 18.80.220(a)(1), which prevents, among other things, discrimination

-32-

"against a person in compensation or in a term, condition, or privilege of employment . . .

because of the person's . . . physical or mental disability[.]"

> To establish a prima facie case for a disability discrimination claim under AS 18.80.220, a plaintiff must show the following:
>
> (1) that he or she is an individual who has a disability within the meaning of the statute; (2) that he or she could perform the essential functions of the position he or she holds (with or without reasonable accommodation); and (3) that he or she has suffered an otherwise adverse employment decision because of the disability.

Reynolds-Rogers v. Dep't of Health & Social Services, 436 P.3d 469, 476 (Alaska 2019).

Plaintiff argues that he has made out a prima facie case of disability discrimination. He argues that the evidence shows that he was experiencing both physical and mental deterioration due to the extreme stress he was under at his job and that after he brought up these issues to management, he was terminated. Plaintiff argues that this shows that he was terminated, in part, because of his physical and mental disabilities. Plaintiff then argues that due to the temporal proximity between his telling defendant he needed time off to deal with his physical and mental health and his termination, causation could be inferred.

As defendant is quick to point out, the problem with this argument is that plaintiff never pled a claim pursuant to AS 18.80.220(a)(1) in his complaint. Plaintiff's second cause of action can only fairly be read to include a claim pursuant to AS 18.80.220(a)(4). And "[i]t is well established that a plaintiff may not advance a new claim or defense at the summary judgment stage without seeking leave to amend." B-K Lighting, Inc. v. Vision3 Lighting,

-33-

930 F. Supp. 2d 1102, 1132 (C.D. Cal. 2013). Plaintiff has not sought leave to amend his complaint to add a claim based on AS 18.80.220(a)(1) and it would be much too late for him to do so now.

Defendant next moves for summary judgment on plaintiff's third cause of action which is a claim for wrongful termination in violation of public policy. In his complaint, plaintiff alleges that he was terminated in retaliation for "reporting and/or opposing unlawful conduct[.]"[91] This claim appears to "be rooted in Alaska's public policy that protects employees who serve as whistleblowers from retaliation." Lingley v. Alaska Airlines, Inc., 373 P.3d 506, 516 (Alaska 2016). "[A] retaliatory discharge in violation of an explicit public policy gives rise to a tort as well as a contract claim." Reust v. Alaska Petroleum Contractors, Inc., 127 P.3d 807, 812 (Alaska 2005) (citation omitted).

Regardless of whether plaintiff has asserted a tort claim, a contract claim, or both in his third cause of action, his claims would fail because there has been no retaliatory discharge here. As discussed above, plaintiff was terminated because he was not working out, and plaintiff has not come forward with any evidence to show that this was pretext for retaliation.

In his opposition, however, plaintiff argues not that he was terminated in retaliation for his protected activity, but rather that he was terminated for a discriminatory reason. Under Alaska law, "probationary employees may be dismissed for any non-discriminatory reason or no reason at all." Willard v. Khotol Services Corp., 171 P.3d 108, 117–18 (Alaska

---

[91]Complaint at 6, ¶ 32, Exhibit 1, Notice of Removal, Docket No. 1.

2007).  Plaintiff argues that there are at least questions of fact as to whether he was terminated because of his physical and mental impairments.

But this is not a claim plaintiff pled in his complaint.  Nowhere in his complaint did plaintiff allege that he was terminated because of his physical and mental impairments.  And, as discussed above, plaintiff cannot add claims at this stage of the litigation.

In sum, plaintiff has not come forward with any evidence to create a genuine issue of material fact as to whether he was terminated in violation of public policy.  Thus, defendant is entitled to summary judgment on plaintiff's claim for wrongful termination in violation of public policy.

Defendant next moves for summary judgment on plaintiff's fourth cause of action, which is a claim for breach of the implied covenant of good faith and fair dealing.  "[A] retaliatory discharge gives rise to a cause of action for breach of the duty of good faith and fair dealing that is implied in employment contracts."  Reed v. Municipality of Anchorage, 782 P.2d 1155, 1158 (Alaska 1989).  "The prima facie elements and the burden shifting analysis applied for such a claim mirrors that which" applies to plaintiff's FCA retaliation claim.  Dunlap, 2019 WL 4580611, at *25.

Plaintiff has not come forward with any evidence that creates a genuine issue of material fact as to whether his termination was retaliatory.  Thus, defendant is entitled to summary judgment on plaintiff's breach of the implied covenant claim.

-35-

Finally, defendant moves for summary judgment on plaintiff's fifth cause of action, which is a claim for punitive damages. Ignoring for the moment that "[p]unitive damages are a form of relief, not a cause of action," <u>Doe v. Colligan</u>, 753 P.2d 144, 145 n.2 (Alaska 1988), this claim fails because all of plaintiff's other claims fail.

<u>Conclusion</u>

Defendant's motion for summary judgment is granted. The clerk of court shall enter judgment dismissing plaintiff's complaint with prejudice.

DATED at Anchorage, Alaska, this 7th day of February, 2022.

<u>/s/ H. Russel Holland</u>
United States District Judge

-36-